335 F.2d 292
 118 U.S.App.D.C. 257
 The PENNSYLVANIA RAILROAD COMPANY et al., Appellants,
v.
C. Douglas DILLON, Secretary of the Treasury, et al., Appellees.
AMERICAN UNION TRANSPORT, INC., Appellant,
v.
C. Douglas DILLON, Secretary of the Treasury, et al., Appellees.
AMERICAN-HAWAIIAN STEAMSHIP COMPANY, Appellant,
v.
C. Douglas DILLON, Secretary of the Treasury, et al., Appellees.
SEATRAIN LINES, INC., Appellant,
v.
C. Douglas DILLON, Secretary of the Treasury, et al., Appellees.
 Nos. 17753, 17755, 17756, 17764.
 United States Court of Appeals District of Columbia Circuit.
 Argued Jan. 2, 1964.
Decided June 26, 1964, Certiorari Denied Dec. 14, 1964, See
85 S.Ct. 437.
 
 Mr. Warren E. Baker, Washington, D.C., for appellant in No. 17756, argued for all appellants.
 Mr. Joseph F. Healy, Jr., Washington, D.C., also entered an appearance for appellant in No. 17764.
 Mr. Jeremiah C. Waterman, Washington, D.C., was on the brief for appellants in No. 17753.
 Mr. George F. Galland, Washington, D.C., was on the brief for appellant in No. 17755.
 Mrs. Amy Scupi, Washington, D.C., also entered an appearance for appellant in No. 17755.
 Mr. Gordon P. MacDougall, Washington, D.C., was on the brief for appellant in No. 17756.
 Miss Kathryn H. Baldwin, Atty., Dept. of Justice, with whom Messrs. David C. Acheson, U.S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellees Dillon, Nichols and Bureau of Customs.
 Mr. Daniel M. Gribbon, Washington, D.C., with whom Mr. William H. Allen, Washington, D.C., was on the brief, for appellee Sea-Land Service, Inc.
 Mr. Robert L. Randall, Washington, D.C., also entered an appearance for appellee Sea-Land Service, Inc.
 Before BAZELON, Chief Judge, and FAHY and BURGER, Circuit judges.
 BURGER, Circuit Judge:
 
 
 1
 Complaints filed by appellants in the District Court sought declaratory judgments and injunctive relief to require appellees to apply Section 27 of the Merchant Marine Act of 1920, 41 STAT. 999 (1920), as amended, 74 STAT. 321 (1960), 46 U.S.C. 883 (Supp. IV 1963), and pertinent Treasury Regulations adopted pursuant thereto[1] so as to deny enrollment in the coastwise trade to certain vessels. The District Court dismissed the complaints and these appeals followed.
 
 
 2
 Three of appellants are coastwise carriers who compete directly with Sea-Land Service, Inc., intervenor, the present owner of the two vessels claimed by appellants to have been illegally enrolled; other appellants are railroads who were granted leave to intervene in the District Court on their allegation that their transcontinental freight carriage is also in substantial direct competition with Sea-Land. Appellants claim that the documenting of two rebuilt vessels by the Commissioner of Customs was a violation of Section 27 of the Act as amended in 1960[2] and its relevant regulations. The 1960 amendment, except for a limited saving clause,[3] prohibited enrollment and licensing of vessels 'jumboized' by installation of foreign-made midbodies, or midsections. Additionally, two appellants contend that an administrative hearing was required on the eligibility of the vessels for enrollment.[4]
 
 
 3
 Appellees contend that appellants are without standing to challenge in court the actions of the Commissioner of Customs and the Secretary of the Treasury with regard to these ships. We agree. Allegation of a legally protected right is a constitutional predicate of standing to attack governmental action. See Joint Anti-Fascist Refugee Committee v. McGrath,341 U.S. 123, 140, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (principal opinion); Gonzalez v. Freeman, 118 U.S.App.D.C. , , 334 F.2d 570, p. 576. The tests for standing to review agency action are found in Section 10(a) of the Administrative Procedure Act:
 
 
 4
 'Right of Review 'Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.'
 
 
 5
 60 STAT. 243 (1946), 5 U.S.C. 1009(a) (1958). Under this statute appellants have standing to challenge agency action which they allege either causes them a 'legal wrong,' or adversely affects or aggrieves them 'within the meaning of any relevant statute.'
 
 
 6
 'Legal wrong,' as we have only recently noted, is the invasion of a legally protected right. See Gonzalez v. Freeman, supra, 117 U.S.App.D.C. at n.6, 334 F.2d at 576 n.6. Thus, in order to make out a claim of 'legal wrong' under Administrative Procedure Act 10(a), appellants must assert some legally protected right to be free of the competition provided by the two vessels whose documentation they are challenging. This court has very recently spoken on this aspect of standing. When 'Congress has not given them any such standing by express or implied provision of statute * * *, mere economic competition made possible by governmental action (even if allegedly illegal) does not give standing to sue in the courts to restrain such action. Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955).' Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 345, 330 F.2d 217, 219 (1964). For purposes of standing in this case, the sufficiency of appellants' allegations of 'legal wrong' thus depend upon congressional intent to bestow upon them a legal right to protection from such competition.
 
 
 7
 Similarly, appellants' allegations that they are 'adversely affected or aggrieved * * * within the meaning of any relevant statute' depend for their adequacy as to standing upon the congressional purpose underlying the relevant sections of the Merchant Marine Act of 1920, as amended. See Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. at 281, 225 F.2d at 932; Jaffe, Standing to Secure Judicial Review: Private Actions, 75 HARV.L.REV. 255, 287 (1961). Under either leg of Section 10(a), therefore, since appellants complain only of government enhancement of economic competition, they must demonstrate 'statutory aid to standing.' Cf. United Milk Producers of New Jersey v. Benson, 96 U.S.App.D.C. 227, 229, 225 F.2d 527, 529 (1955).
 
 
 8
 Appellants contend that the statutory scheme of barring from the coastwise trade ships which were rebuilt abroad or whose midbodies were built abroad was intended to promote on equal terms competition between coastwise carriers and thus to protect and benefit the shipowner appellants in the interests they are asserting. That some competitive parity is one of the consequences of these statutory provisions is doubtless correct; but the broad congressional purpose underlying these particular enactments was to stimulate and encourage resort to domestic shipyards and thus ensure them sufficient business so that their facilities would be adequate in time of national emergency. Congress did not intend to insulate coastwise carriers from other domestic competition or to give them any legally protected right to be free of such competition.[5]
 
 
 9
 Finally, appellants rely upon Atchison, Topeka and Santa Fe Railway Company v. Summerfield, 97 U.S.App.D.C. 203, 229 F.2d 777 (1955), cert. denied, 351 U.S. 926, 76 S.Ct. 779, 100 L.Ed. 1456 (1956), for the proposition that their prior investments in American-built and-rebuilt ships as prerequisite to engaging in the coastwise trade give them standing to challenge action which may diminish the value of those investments. The Atchison case does not stand for that proposition; there this court found that the appellant railroads had standing to challenge a decision of the Postmaster General to conduct an experimental program of transporting first-class mail between certain points via air rather than the customary rail route. It was the 'present interest stemming from substantial investments in cars and equipment' so purchased that gave 'the plaintiff railroads * * * standing in court to challenge the alleged illegal act.' 97 U.S.App.D.C. at 205, 229 F.2d at 779. Essential to Atchison's standing in that case was the fact that the Postmaster had 'explicitly discontinued the use of certain railroad equipment,' which the railroads had 'acquired * * * because they were commanded to do so by law.' Ibid. Although appellants are required to use vessels built or rebuilt in American yards in order to engage in the coastwise trade, any economic loss from competition with carriers who secure the benefit of lower construction costs under the saving clause of the 1960 amendment is a speculative injury which does not afford a basis for standing.[6]
 
 
 10
 We therefore conclude that under Administrative Procedure Act 10(a), 60 STAT. 243, 5 U.S.C. 1009(a) (1958), appellants' allegations do not sufficiently claim that appellants have suffered a 'legal wrong' or have been 'adversely affected or aggrieved * * * within the meaning of' the Merchant Marine Act of 1920, as amended.
 
 
 11
 Affirmed.
 
 
 
 [1]
 19 C.F.R. 3.2(f), 3.28(d) (1964)
 
 
 [2]
 'No vessel fo more than five hundred gross tons which has acquired the lawful right to engage in the coastwise trade, by virtue of having been built in or documented under the laws of the United States, and which has later been rebuilt, shall have the right thereafter to engage in the coastwise trade, unless the entire rebuilding, including the construction of any major components of the hull or superstructure of the vessel, is effected within the United States, its Territories (not including trust territories), or its possessions * * *.'
 
 
 [74]
 STAT. 321 (1960), 46 U.S.C. 883 (Supp. IV 1963)
 
 
 [3]
 'This Act shall be effective from the time of enactment hereof: Provided, however, That no vessel shall be deemed to have lost its coastwise privileges as a result of the amendments made by this Act if it is rebuilt within the United States, its Territories (not including trust territories), or its possessions under a contract executed before such date of enactment and if the work of rebuilding is commenced not later than twenty-four months after such date of enactment.' P.L. 86-583, 4, 74 STAT. 321 (1960), 46 U.S.C. 883 (Note; Supp. IV 1963)
 
 
 [4]
 Although we do not reach the merits, the background of appellants' claims is important. In June and July of 1962, appellants Seatrain Lines, Inc., and American-Hawaiian Steamship Co. advised the Commissioner of Customs that intervenor Sea-Land Service, Inc., had publicly announced the conversion of two American-built tankers for use in the coastwise trade by insertion of foreign-built midsections; appellants alleged this was an attempt to avoid the prohibition against the use of foreign midbodied vessels in the coastwise trade without compliance with the saving clause, quoted at note 3, supra. Although the construction contracts were executed before the cutoff date in the saving clause of the 1960 amendment, appellants alleged that the contracts were not bona fide rebuilding agreements within the terms of the saving clause. Appellants protested any documentation of these two vessels, and requested a full evidentiary hearing. Following a conference the Commissioner advised that no application for documentation of the challenged ships had been received, that these allegations had been considered, but that they did not justify holding that the rebuilding of the vessels was outside the saving clause. After appellants had again requested an evidentiary hearing, the Assistant Secretary of the Treasury replied that the Secretary had advised the Commissioner to consider appellants' 'application with due regard to the interests of all (protesting) Steamship Companies * * *' and that the questions raised would be 'fully examined.' Shortly thereafter the Commissioner invited appellants to present arguments and documents to him at an 'informal' meeting on the application for documentation of one of the challenged vessels; the Commissioner noted, however, that no formal hearing was required under the Administrative Procedure Act or any other statute and none would be held. Appellants presented documentary evidence to the Commissioner, but they were not afforded an opportunity to call witnesses, examine documents in the possession of the Commissioner, or obtain production of additional documents. Immediately thereafter the Commissioner announced he would enroll the vessels. American-Hawaiian protested to the Secretary of the Treasury the Commissioner's failure to conduct a full investigation; Seatrain then instituted the present action and the other appellants were granted leave to intervene in the District Court
 
 
 [5]
 From the earliest days of the Republic, Congress has been concerned with stimulating and protecting the growth of an American-built and controlled coastwise Merchant Marine. See 1 STAT. 27-28 (1789). Encouragement of a strong United States-flagship Merchant Marine was the primary motivation for the Merchant Marine Act of 1920, see S.REP. No. 573, 66th Cong., 2d Sess. 1-6 (1920); 59 CONG.REC. 7342 (1920) (Remarks of Sen. Ransdell), although protection of shipyards was even then of auxiliary importance, see 41 STAT. 997-98 (1920) (tax concessions to shipwners engaging in foreign trade must be used to construct new ships in domestic yards). In 1935, the Act was amended to prohibit operation in the coastwise trade of vessels which after being built in American shipyards or documented under the laws of the United States were sold to foreign owners. 49 STAT. 442 (1935). The principal aim of this amendment was to encourage resort to American shipyards by preventing cheap purchase of ships which previously had been sold to a foreign buyer. See S.REP. No. 870, 74th Cong., 1st Sess. 3 (1935); H.R.REP. No. 118, 74th Cong., 1st Sess. 3 (1935). In the Senate and House Reports on this 1935 amendment appears the sole mention of congressional concern for protecting coastwise carriers from the competition of cheaper domestic vessels. See S.REP. No. 870, supra; H.R.REP. No. 118, supra. For a discussion of more modern Merchant Marine legislation, see generally, Morse, A Study of American Merchant Marine Legislation, 25 LAW & CONTEMP. PROB. 57 (1960)
 A 1956 amendment for the first time made ship rebuilt abroad ineligible for the coastwise trade. 70 STAT. 544 (1956). This 1956 amendment was 'introduced at the request of the shipbuilding and repair interests of the country, (and) was designed to assist the shipyards of the United States by making applicable to vessels rebuilt in foreign yards the historic policy of exclusion from coastwise trade which has always applied, with certain exceptions, to vessels constructed outside the United States,' S.REP. No. 2395, 84th Cong., 2d Sess. 1 (1956) U.S.Code Congressional and Administrative News, p. 3162; see 102 CONG.REC. 11825 (1956) (Remarks of Sen. Bible); it was opposed 'by a witness representing several steamship associations.' S.REP. No. 2395, supra at 2; cf. id. at 7 (Letter from Sec. of Comm. to Ch'm'n, Comm. on Interst. and For. Commerce); H.R.REP. No. 2293, 84th Cong., 2d Sess. 3 (Letter from Sec'y of Commerce to Ch'm'n, Comm. on Merch. Mar. and Fisheries). The Navy Department recognized that the 1956 amendment would 'aid this seriously distressed industry (shipbuilding), and would assist the Department of Defense in its attempts to maintain the mobilization capacity of this country's shipyards.' S.REP. No. 2395, supra at 2; H.R.REP. No. 2293, supra at 6 (Letter from Act'g Judge Adv. Gen. of the Navy to Ch'm'n, Sen. Comm. of Interst. and For. Commerce and to Ch'm'n, House Comm. on Merch. Mar. and Fisheries). Thus, this amendment, the direct antecedent of the 1960 amendment, was intended basically as a benefit to shipyards not shipowners in the coastwise trade. See S.REP. No. 2395, supra at 1-9; H.R.REP. No. 2293, supra at 2-8.
 The 1960 amendment was passed in response to a ruling of the Commissioner of Customs, which the 'shipbuilding officials in this country viewed with alarm,' S.REP. No. 1279, 86th Cong., 2d Sess. 3 (1960), U.S.Code Congressional and Administrative News, p. 2666; H.R.REP. No. 1887, 86th Cong., 2d Sess. 3 (1960), that foreign midbodies could be used in the rebuilding of domestic ships without forfeiture of coastwise privileges. Both committees reported that the bill was 'needed to close the above-mentioned loophole in the existing (1956) statute and to buttress our traditional national objectives affecting the coastwise trade and the shipbuilding industry.' Ibid. And see S.REP. No. 1279, supra at 4, 6; H.R.REP. No. 1887, supra at 4, 5 (Letter from Acting Sec'y of the Treas. and Letter from Sec'y of Commerce to Ch'm'n, Sen. Comm. on Interst. and For. Commerce and Ch'm'n, House Comm. on Merch. Mar. and Fisheries). Congressional debate on the 1960 amendment, as on its 1956 forerunner, was extremely brief. However, an indication of congressional purpose may be drawn from the remarks of Representative Gross:
 'I am glad to see this interest in protecting American industry and American labor by requiring that the rebuilding of ships be carried out in American yards. I hope that the Members of the House will extend the same treatment * * * (and) give some protection to agriculture as well as the shipbuilding industry.'
 
 
 [106]
 CONG.REC. 14253 (1960) (Remarks of Rep. Gross)
 Thus, the exclusion from coastwise trade of ships rebuilt with foreign midsections was the final step in effectuation of an historic congressional purpose to aid shipbuilding interests, a purpose evidenced in the 1920 Act and in the 1935 and 1956 amendments.
 The original reason underlying congressional concern for the adequacy of American shipyards was to ensure the availability of sufficient construction and repair facilities to meet the needs of defense mobilization in a time of national emergency. Undeniably, provision for adequate repair and construction facilities at home is, at least in part, also necessary to a strong American coastwise maritime fleet. Thus, in a general sense, promotion of shipyard interests serves the paramount historic policy of providing for a strong Merchant Marine. And to a certain extent, then, just as it can be argued that a viable Merchant Marine is fostered by competition on equal terms between coastwise vessels, it may be contended with some merit that as shipyard interests are furthered, so are those of the coastwise shipowners. This rather attenuated consequence, however, does not of itself import into the enactments of 1956 and 1960-- regarding foreign rebuilding-- the congressional purpose of creating legally protected rights in coastwise carriers such as appellants. Indeed, as we have shown, the very scanty legislative history which is available on the intendment of these acts demonstrates no such concern on the part of Congress. It is difficult therefore to conclude that Congress intended by these acts to confer a benefit on operators in the coastwise trade.
 
 
 [6]
 Appellants' reliance on Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Company, 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), cert. granted, 376 U.S. 948, 84 S.Ct. 967, 11 L.Ed.2d 969 (1964), is also misplaced. There, this court held that certain state banks had standing to attempt to enjoin the Comptroller of the Currency from issuing to a national bank a Certificate of Authority allegedly in violation of federal banking statutes. The court found that federal statutes had guaranteed that state banks would be free of certain competition from national banks